UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VRITA MARINE CO LTD.,

                   *Plaintiff,*                  **08 Civ. 5614 (JSR)**

   -   against -

SEAGULF TRADING LLC, AL AQILI GROUP, AL
AQILI TRADING, AL AQILI DISTRIBUTION, GULF
CENTRE FOR SOAP AND CHEMICAL INDUSTRIES
LLC, KOOHIJI GROUP, GULF HORIZON INTERNATIONAL
TRADING L.L.C., AL AQILI FURNISHINGS, and AL AQILI
FUTURE TECHNOLOGIES LLC.,

                   *Defendants.*
------------------------------------------------------------X

## DECLARATION OF LEONTIOS HATZIMICHALIS

    I, LEONTIOS HATZIMICHALIS, pursuant to Section 1746 of Title 18 of the

United States Code, hereby declare and say the following under penalty of perjury:

1. I am an individual of sound mind and body, and have never been convicted of a crime
   of moral turpitude.

2. I make this affidavit from personal knowledge and official records kept by my office
   and by clients Vrita Marine Company Ltd. and St. James Shipping, Inc.

3. I am a graduate of the National University of Athens in Law following a five (5) year
   statutory course study curriculum.

4. I am a Barrister-at-Law admitted and sworn to practice as a member of the Bar of the
   City of Piraeus since 1974.

5. I have been exclusively involved in international shipping for nearly forty (40) years,
   working both as in-house legal advisor for companies involved in the business of
   international shipping and maritime trade, as well as outside counsel for both
   privately held and publicly traded shipping companies

6.  I have also served as special Greek counsel for many U.S. and European banks and other publicly listed international companies who are also involved in international shipping and ship finance matters.

7.  I have been personally involved in over three hundred fifty (350) ship sale & purchase transactions, including demolition sales, as was the case with the M/V VRITA N.

8.  I was personally involved in the transaction involving the M/V VRITA N.

9.  During the summer of 1998, a Piraeus-based shipbroker named Andreas Ropalis had contacted my client, St. James Shipping Inc., to advise that the Owners of the bulk carrier the M/V VRITA N had decided to sell the vessel for demolition as the vessel's Class and trading certificates had expired and the Owners were not prepared to invest in the 5-year class renewal special survey which was due at or about that time.

10. The M/V VRITA N was owned by Vrita Marine Company Ltd. and managed by St. James Shipping Inc.

11. At all relevant times, including through present, I have been continuously engaged and acting as corporate counsel for both Vrita Marine Company Ltd. and St. James Shipping Inc.

12. After this initial approach by Mr. Ropalis, I was requested to (and did) attend a meeting in Piraeus on behalf of my clients, the owner and manager of the vessel. During the course of the meeting, another Piraeus-based shipbroker, George Daskalakis made a presentation to me and my clients concerning his clients and their intention to purchase the M/V VRITA N for demolition.

13. During the course of the meeting, Mr. Daskalakis advised that Sea Gulf Trading LLC was a Dubai based company that was operated and controlled by the Al Aqili Group of Companies, which wanted to buy the M/V VRITA N for demolition.

14. It was further represented that the Al Aqili Group was a significant trading company operating through various subsidiary companies. In fact, all in attendance were provided with a copy of a letter written on Al Aqili letterhead, which described Sea Gulf Trading LLC as a part of the Al Aqli Group and marketed Sea Gulf Trading LLC, (as well as all the other companies listed as part of the group), as having the both the strength and the resources of the Al Aqili Group.

15. Additionally, a print out from the Al Aqili Group's website was provided which identified all of the defendants, as well as numerous other companies, as being commonly owned, controlled and operated.

16. All of the companies listed as part of the Al Aqili group shared common offices and Email domain names.

17. Additionally, during the course of the meeting, I was provided with photocopies of the business cards of two (2) men with Arabic names who Mr. Daskalakis identified as the men "in-charge" on behalf of the buying group. Although I do not recall the names of these individuals (and have not yet been able to locate these cards in my files), I clearly remember that one of the cards identified the person as CFO of the Al Aqili Group and the other the CEO of Sea Gulf Trading LLC.

18. Both cards identified the companies as having the same office address and the Emails for each of the men shared the same domain name.

19. Again, Mr. Daskalakis, the local agent for the Al Aqili Group, clearly, unambiguously, confirmed that these two (2) men were the people "in charge" of what he called the "buying group."

20. At the time, the demolition market for ships was dominated by ship-breakers and scrap-metal dealers located in India, Pakistan and Bangladesh and was notorious for rogue trading practices and dishonest schemes.

21. Having had personal (and very unpleasant) experience with such crooked practices for other clients in connection with other transactions, I requested that both my clients and I be provided with some assurance that Sea Gulf Trading LLC and Al Aqili Group were not just another one of the many crooked, "fly by night" companies involved with ship purchase and demolition schemes that were so prevalent at the time.

22. In response to my request for such assurances, Mr. Daskalakis presented me with a summary of some twenty-five (25) to thirty (30) other such ship demolition projects that the Al Aqili Group had completed within the previous twelve (12) months prior to that meeting and assured me that the group was serious.

23. Additionally, my clients and I were assured of the stability of the Al Aqili Group of Companies and reassured that they were reputable and would fully honor any deal to be concluded with respect to the M/V VRITA N.

24. In reliance upon these express promises, assurances and representations concerning the Al Aqili Group, further negotiations were engaged. Ultimately, a Memorandum of Agreement ("MoA") was concluded.

25. A true and complete copy of the relevant MoA is attached hereto as Exhibit "A."

26. During August of 1998, I was advised by my clients that there was a problem with the delivery of the vessel at Chittagong, Bangladesh and that the buyers had refused to take delivery in accordance with the MoA despite my clients delivering the vessel and having incurred all the costs and expenses to do so.

27. After various attempts to persuade the buyers to honor their obligations, my clients sought to mitigate their damages and sold the vessel to another local buyer.

28. Thereafter, I, on behalf of my clients, engaged a London Solicitor to commence arbitration in accordance with the previously agreed terms and conditions set forth in the MoA to recover their damages, which included, *inter alia,* the cost of delivering the vessel to Chittagong, agency fees, port expenses, crew wages and repatriation costs, etc.

29. After receiving my clients' demand for arbitration, Sea Gulf Trading LLC responded by proposing the matter to be heard by a sole arbitrator, Mr. William Packard, in accordance with the London Maritime Arbitration Association's rules as provided in Clause 19 of the MoA.

30. During early 1999, various hearings were held and Solicitors acting for both parties presented their clients' case. The merits of the dispute were fully litigated.

31. On or about August 11, 1999, the Arbitrator issued his award and ordered Sea Gulf Trading LLC to pay the Plaintiff herein USD 222,484.08, plus compound interest at a rate of 7.5% to run quarterly from August 10, 2008.

32. A true and complete copy of the Award is attached hereto as Exhibit "B."

33. After numerous unsuccessful attempts to obtain payment on the Award through the English solicitors, I sent a copy of the Award to Sea Gulf Trading <u>and</u> the Al Aqili

Group at the Al Aqili headquarters in Dubai.  A copy was also sent through the brokerage channels pursuant to which the initial approach from the Al Aqili Group was made.

34. In response, my clients received a written response on Al Aqili letterhead stating that Sea Gulf Trading LLC had been placed into liquidation by its principals, the Al Aqili Group.

35. It is my firm belief that such dissolution efforts were undertaken to avoid paying the Award.

36. A response was sent by my clients to object to such dishonest and fraudulent conduct.

37. Thereafter, a representative of the Al Aqili Group gave my clients and me the name of "a purported liquidator" for Sea Gulf Trading LLC and advised that this was the person to contact in order to present the claim for payment in connection with the alleged liquidation proceeding.

38. Both the name and contact details for the purported "liquidator" proved to be phony.

39. Thereafter, I wrote to the Chamber of Commerce in Dubai to advise them of the unfortunate situation my clients were forced to endure and to refer the matter for whatever remedial measures and/or disciplinary action the Chamber might have been able to provide.

40. Although no response was ever received from the Chamber of Commerce, my clients and I did receive a letter from a Dubai law firm advising that they had been instructed to act on behalf of the Al Aqili Group of Companies and repeated that Sea Gulf Trading LLC had been placed into liquidation by "its principals" and, consequently, the Award would not be paid.  No further information was provided.

41. I am quite sure that the defendants are, in fact, alter-egos of each other. To the extent the Court would like to see additional evidence in this regard, I am sure that it will be absolutely clear at the conclusion of the discovery process that the companies: (1) disregarded corporate formalities; (2) were inadequately capitalized; (3) intermingled funds; (4) intermingled property; and (5) shared common office space, addresses, telephone numbers and e-mail domain names.

42. It will also become clear that the defendants did not deal at arms-length between themselves and were controlled by the same beneficial ownership, officers, directors and personnel.

43. It will also become clear that Sea Gulf Trading LLC was controlled and dominated by the Al Aqili Group; the very same group that now shamelessly asks this Court to vacate the pending attachment and to assist in perpetuating their fraudulent conduct.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge.

Dated: July 31, 2008
      Piraeus, Greece

LEONTIOS HATZIMICHALIS

# EXHIBIT "A"

MEMORANDUM OF AGREEMENT

## 2ND ORIGINAL

DATED: 15TH JULY, 1998

MESSRS
VRITA MARINE COMPANY LIMITED
DIAGORAS HOUSE , 16 P.CATELARIS STREET, 1097 NICOSIA, CYPRUS
C/O ST.JAMES SHIPPING INC. (AS MANAGERS OF THE SELLERS)
67 AKTI MIAOULI, 185 37 PIRAEUS GREECE
PHONE: 01 4283680/1  FAX: 01 4283684  TLX: 213428
AS OWNERS AND HEREINAFTER CALLED SELLERS, HAVE SOLD AND

MESSRS SEAGULF TRADING L.L.C., DUBAI
P.O.BOX 27539, DUBAI, U.A.E. -
PHONE: 820335, FAX: 820353
HEREINAFTER CALLED THE BUYERS

HAVE TODAY BOUGHT  THE M.V. 'VRITA N' EX 'BRITANNIA' EX 'BLUESTONE'
EX 'ASIA SWALLOW' FOR DEMOLITION ONLY

BUILT: 1971 OSAKA SHHIPBUILDING CO. LTD, JAPAN
REGISTER TONNAGE: GRT 14824  NRT  8068

WITH EVERYTHING BELONGING TO HER, ON BOARD BUT EXCLUDING PERSONAL
EFFECTS AND BELONGINGS OF MASTER, OFFICERS AND CREW AND ITEMS
SPECIFIED IN CLAUSE 10, ON THE FOLLOWING CONDITIONS:

1. PRICE USD 120.- PER LONG TON, OF LIGHT DISPLACEMENT TON
EXCLUDING PERMANENT BALLAST
LDT BEING 6210 METRIC TONS (6112.20 LONG TONS)

TOTAL PRICE: USD  733,464.- (UNITED STATES DOLLARS SEVEN HUNDRED
THIRTY-THREE THOUSAND FOUR HUNDRED SIXTY-FOUR ONLY.-)

2. THE PURCHASE PRICE OF THE VESSEL, THAT IS USD 733,464.-
(UNITED STATES DOLLARS SEVEN HUNDRED THIRTY-THREE THOUSAND FOUR HUNDRED
SIXTY-FOUR ONLY.-) (HEREINAFTER CALLED THE PURCHASE PRICE)

SHALL BE PAYABLE AS FOLLOWS :
TEN (10) PERCENT OF THE  PURCHASE PRICE TO BE DEPOSITED INTO AN
INTEREST BEARING JOINT ACCOUNT BETWEEN "ST.JAMES SHIPPING INC" (AS
MANAGERS OF THE SELLERS) AND THE BUYERS AT THE BANK NOMINATED BELOW
WITHIN 24 HOURS AFTER BUYERS DECLARE  THEIR OPTION FOR DELY CHITTAGONG.
IN CASE BUYERS DECLARE AS DELIVERY PORT ALANG / W.C.INDIA, THEN
DEPOSIT WILL BE LODGED WITHIN 24 HOURS AFTER SELLERS ACCEPTANCE OF
SUCH OPTION. SELLERS WILL DECLARE THEIR ACCEPTANCE/ REJECTION WITHIN 3
DAYS AFTER RECEIPT OF BUYERS NOMINATION OF PORT ALANG.
INTEREST EARNED TO BE CREDITED TO BUYER'S ACCOUNT.

THE DEPOSIT SHALL BE HELD BY THE FOLLOWING BANK:-
THE ROYAL BANK OF SCOTLAND PLC
PIRAEUS BRANCH, 61 AKTI MIAOULI STR., PIRAEUS, GREECE
TEL: 4596500    FAX: 4293321
ANY CHARGES IN CONNECTION WITH HOLDING SAID DEPOSIT SHALL BE BORN
EQUALLY BETWEEN SELLER'S AND BUYER'S .

BALANCE 90 PCT OF THE PURCHASE PRICE (LESS 3 PCT BUYERS' ADDRESS
COMMISSION), SHALL BE MADE BY BANK WIRE TRANSFER TO SELLERS  NOMINATED
BANK "ROYAL BANK OF SCOTLAND PLC, PIRAEUS BRANCH"
ACCOUNT NO. 518665-100 FAVOUR OF "ST.JAMES SHIPPING INC." (AS
MANAGERS OF THE SELLERS) IMMEDIATELY UPON DELIVERY OF THE VESSEL BUT

12-AUG-1999  17:04          PACKARD                              441206383939    P.41/47

NOT LATER THAN 3 (THREE) BANKING DAYS FROM TENDERING NOR AS PER THE MOA AND IN EXCHANGE OF THE AGREED CLOSING DOCUMENTS IN PIRAEUS ALONGWITH THE AFORESAID 10 PCT DEPOSIT WHICH SHALL BE RELEASED TO SELLERS AT THE TIME OF CLOSING/PAYMENT OF THE BALANCE PURCHASE PRICE.

3. THE FOLLOWING DOCUMENTS SHALL BE SUBMITTED BY THE SELLERS TO THE BUYERS REPRESENTATIVE IN GREECE ( A DIRECTOR OF "ALLIED SHIPBROKING INC") AT THE OFFICES OF SAID COMPANY OR AT OFFICES OF SELLERS BANK.

I) SIGNED COMMERCIAL INVOICE IN SEXTUPLICATE CERTIFYING THE DETAILS OF THE VESSEL AND THE PURCHASE PRICE AS PER THIS MOA.

II) LEGAL BILL OF SALE IN FAVOUR OF THE BUYER CERTIFYING THAT VESSEL IS FREE FROM ALL ENCUMBRANCES, MARITIME LIENS, MORTGAGES AND ANY OTHER DEBTS WHATSOEVER DULY SIGNED BY THE DIRECTORS OF THE SELLERS OR THEIR DULY APPOINTED ATTORNEYS, DATED AND LEGALISED BY THE CYPRUS CONSULATE IN PIRAEUS GREECE.

III) CERTIFICATE FROM THE SELLER OR THEIR ATTORNEYS-IN-FACT CERTIFYING THAT THE VESSEL AT THE TIME OF DELIVERY IS FREE FROM ALL ENCUMBRANCES, MARITIME LIENS , MORTGAGES AND ANY OTHER DEBTS WHATSOEVER, AND AN UNDERTAKING FROM SELLERS TO INDEMNIFY BUYERS AGAINST CONSEQUENCES OF ANY CLAIMS THAT MAY HAVE OCCURED PRIOR TO THE TIME OF DELIVERY OF THE VESSEL TO THE BUYERS.

IV) ORIGINAL TRANSCRIPT OF REGISTER OR CERTIFICATE ISSUED BY THE CYPRUS CONSULATE IN PIRAEUS CERTIFYING THAT THE VESSEL "VRITA N" IS OWNED BY VRITA MARINE COMPANY LIMITED AND THE VESSEL IS FREE OF MORTGAGES AND ANY OTHER REGISTERED ENCUMBRANCES (AS PER CYPRUS AUTHORITIES STANDARD WORDING)

ABOVE CERTIFICATE IS ISSUED UNDER THE AUTHORITY GIVEN FROM CYPRUS REGISTRATION AUTHORITIES.

SUCH CERTIFICATE TO BE DATED NOT MORE THAN 3 DAYS FROM SELLERS TENDERING NOTICE OF READINESS.

V) LETTER OF UNDERTAKING FROM THE SELLER STATING THAT IMMEDIATELY AFTER THE PURCHASE PRICE HAS BEEN RECEIVED IN FULL, THEY WILL TELEGRAM/TELEX THE MASTER OF THE VESSEL AND THEIR AGENT TO DELIVER THE SAID VESSEL TO THE BUYER'S REPRESENTATIVE ON CONDITION AS SHE IS SAFELY AFLOAT,SUBSTANTIALLY INTACT,FREE OF EXTERNAL LEAKAGES, FREE OF FIRE DAMAGE, FREE OF CARGO, CHARTER FREE WITH ALL BELONGINGS INCLUDED, INCLUDING WIRELESS EQUIPMENT, "NAVAIDS ALL REMAINING BUNKERS/ LUBS AND ALL AUXILLIARIES/ GENERATORS TO BE IN WORKING CONDITION NORMAL WEAR AND TEAR. VESSEL TO BE DELIVERED WITH HOLDS EMPTY AND REASONABLY CLEAN, HATCHES CLOSED,  DERRICKS LOWERED AND WITHOUT PERMANENT BALLAST.

VI) LETTER OF UNDERTAKING FROM THE SELLERS GUARANTEEING THAT THEY WILL SUBMIT TO THE BUYERS A DELETION CERTIFICATE FROM THE AUTHORITIES OF THE VESSEL'S PORT OF REGISTRY AS SOON AS POSSIBLE BUT NOT LATER THAN 3 MONTHS FROM THE DATE OF DELIVERY.

VII) BOARD OF DIRECTORS MINUTES APPROVING THE SALE.

VIII) POWER OF ATTORNEY AUTHORISING SELLER'S REPRESENTATIVES TO ACT ON THEIR BEHALF INCLUDING SIGNING DELIVERY DOCUMENTS AND ACCEPTING PAYMENT OF THE PURCHASE PRICE.

IX) COPIES OF LIGHTWEIGHT VERIFICATION DOCUMENTS E.G. :

- TRIM AND STABILITY BOOKLET STAMPTED AS ORIGINAL

- BUILDERS CAPACITY PLAN  STAMPTED BY BUILDERS

VERIFYING VESSEL'S LIGHWEIGHT TOBE 6210 METRIC TONS.

X) COPY OF VESSEL'S CERTIFICATE OF REGISTRY - CERTIFICATE OF VESSEL'S NATIONALITY.

COPIES OF DOCUMENTS IX) A. AND B.   TO BE FORWARDED TO BUYERS WITHIN FIVE DAYS FROM TIME 10 PERCENT DEPOSIT LODGED BY THE BUYERS.

COPIES OF THE ABOVE DOCUMENTS DULY EXECUTED (NON NEGOTIABLE) IN FACSIMILE FORM TO BE FURNISHED TO THE BUYERS FOR THEIR ACCEPTANCE BY THE SELLERS AT LEAST 2 DAYS PRIOR TO TENDERING NOTICE OF READINESS BY THE SELLERS AT THE PORT OF DELIVERY, EXCEPT FOR DOCUMENT IV), WHICH TO BE FAXED TO BUYERS ON THE DATE OF ISSUANCE, BUT ANYWAY PRIOR TO SELLERS' TENDERING NOTICE OF READINESS.

4. SELLERS SHALL DELIVER AND BUYERS SHALL TAKE DELIVERY OF THE VESSEL AT A SAFE ACHORAGE ALANG/ W.C.INDIA  OR OFFICIAL OUTER ANCHORAGE CHITTAGONG/ BANGLADESH AT BUYERS OPTION. SUCH OPTION TO BE DECLARED WITHIN 3 DAYS AFTER FASCIMILE M.OA. SIGNED BY BOTH PARTIES. BUYERS TO MAKE THEIR BEST EFFORTS TO DECLARE THIS EARLIER.
IN CASE BUYERS DECLARE AS DELIVERY PORT  ALANG/ W.C.INDIA, THEN SELLERS HAVE AN OPTION TO DECLARE THEIR ACCEPTANCE AND/ OR REJECTION WITHIN 3 DAYS AFTER RECEIPT OF BUYERS DECLARATION IN CASE SELLERS REJECT BUYERS DECLARATION ALANG  THEN SALE WILL BE NULL AND VOID.
VESSEL TO BE DELIVERED UNDER HER OWN POWER BETWEEN 25TH JULY 1998 AND 15TH AUGUST 1998 WITH 15TH AUGUST 1998 CANCELLING DATE IN BUYERS OPTION.

THE VESSEL SHALL BE DELIVERED SAFELY AFLOAT "AS IS" SUBSTANTIALLY INTACT FREE, FREE OF EXTERNAL LEAKAGES OF FIRE DAMAGE, FREE OF CARGO, CHARTER FREE WITH ALL BELONGINGS INCLUDED, INCLUDING WIRELESS EQUIPMENT, NAVAIDS, ALL REMAINING BUNKERS/ LUBS AND MAIN AUXILLIARIES/ GENERATORS TO BE IN WORKING CONDITION AT THE TIME OF DELIVERY NORMAL WEAR AND TEAR ACCEPTED (GEAR)  AND WITHOUT ANY REMOVALS EXCEPT PERSONAL EFFECTS OF MASTER/OFFICERS AND CREWS.
VESSEL TO BE DELIVERED WITH HOLDS EMPTY AND REASONABLY CLEAN, FOR THE INTENDED USE, HATCHES CLOSED, DERRICKS LOWERED AND WITHOUT PERMANENT BALLAST.

5. VESSEL TO BE DELIVERED FREE FROM ALL ENCUMBRANCES, MARITIME LIENS, MORTGAGES AND ANY OTHER DEBTS WHATSOEVER AND SELLERS TO INDEMNIFY BUYERS AGAINST CONSEQUENCES OF ANY CLAIMS THAT MAY HAVE OCCURRED PRIOR TO THE TIME OF DELIVERY OF THE VESSEL TO THE BUYERS.
ANY TAXES, NOTARIAL AND/OR CONSULAR AND/OR OTHER CHARGES AND/OR EXPENSES CONNECTED WITH CLOSING OF THE SELLERS' REGISTER, SHALL BE FOR THE SELLERS ACCOUNT.

6. THE VESSEL WITH EVERYTHING BELONGING TO HER SHALL BE AT SELLERS' RISK AND EXPENSE UNTIL SHE IS DELIVERED TO THE BUYERS, BUT SUBJECT TO CONDITIONS OF THIS CONTRACT, THE VESSEL WITH EVERYTHING BELONGING TO HER SHALL BE DELIVERED AND TAKEN OVER AS SHE IS AT THE TIME OF PHYSICAL DELIVERY, AFTER WHICH THE SELLERS HAVE NO RESPONSIBILITY FOR POSSIBLE FAULTS OR DEFICIENCIES OF ANY DESCRIPTIONS.

THE SELLERS SHALL GIVE BUYERS  5 DAYS AND 3 DAYS APPROXIMATE NOTICE OF VESSELS READINESS FOR DELIVERY BY FAX VIA THE BROKERS MESSRS ALLIED.

7. A) THE SELLERS SHALL ISSUE THE NOTICE OF READINESS FOR DELIVERY ONLY AFTER THE VESSEL HAS ARRIVED AT DELIVERY PORT AND IS READY IN ALL RESPECTS FOR PHYSICAL DELIVERY AS PER THIS AGREEMENT ALONG WITH THE FOLLOWING CERTIFICATES FROM A REPUTED, LICENSED AND INDEPENDENT SURVEYOR AT THE PORT OF DELIVERY.

I) PORTWORTHY CERTIFICATE STATING THAT THE VESSEL IS SAFELY AFLOAT.

II) CERTIFICATE CONFIRMING THE LDT OF VESSEL IS 6210 METRIC TONS EQUIVALENT TO 6112.20 LONG TONS, AS PER COPIES OF LIGHTWEIGHT

EVIDENCE MENTIONED HEREBELOW:

- TRIM AND STABILITY BOOKLET STAMPED AS ORIGINAL
- BUILDERS CAPACITY PLAN STAMPED BY BUILDERS

III) CERTIFICATE THAT ONE BRONZE WORKING PROPELLER, ONE BRONZE SPARE PROPELLER AND ONE SPARE TAILSHAFT HAVE BEEN SIGHTED.

IV) CERTIFICATE FROM THE MASTER OF THE VESSEL CONFIRMING THAT THE MASTER, OFFICERS AND CREW HAVE NO PENDING DUES ON THE VESSEL AT THE TIME OF DELIVERY.

V) CERTIFICATE FROM THE LOCAL AGENTS OF THE SELLERS AT THE PORT OF DELIVERY STATING THAT THEY HAVE GOT NO PENDING AGAINST THE VESSEL AT THE TIME OF DELIVERY.

VI) CERTIFICATE CONFIRMING THE DESCRIPTION OF THE VESSEL AS PER CLAUSE 18 OF THIS MEMORANDUM OF AGREEMENT.

ALSO IN CASE CHITTAGONG DELIVERY SELLERS TO PROVIDE FOLLOWING ADDITIONAL CERTIFICATES FROM CONCERNED AUTHORITIES :

I)    PORT CLEARANCE CERTIFICATE
II)   RUMMAGING CERTIFICATS
III)  A COPY OF THE IMPORT GENERAL MANIFEST ACCEPTED BY THE CHITTAGONG CUSTOM HOUSE CONFIRMING THAT VESSEL IS FOR SCRAP.

8. THE NOTICE OF READINESS SHOULD BE SERVED ON BUYERS OR BUYER'S AGENTS OR BUYER'S NOMINATED REPRESENTATIVE, NOT LATER THAN 15TH AUGUST 1998 BY WRITTEN LETTER, WHEN CLAUSE 7 HAS BEEN COMPLIED WITH BY THE SELLERS. THE VESSEL SHALL BE DELIVERED TO BUYERS IMMEDIATELY AFTER SELLERS RECEIVED THE FULL PURCHASE PRICE WITHIN LATEST THREE WORKING DAYS AFTER TENDERING SUCH NOTICE OF READINESS.

9. THE SELLERS AT THE TIME OF DELIVERY, SHALL HAND OVER TO BUYERS ON BOARD THE VESSEL ALL CLASSIFICATION CERTIFICATES AND/OR COPIES (FOR HULL, ENGINES, ANCHORS, CHAINS ETC), WHETHER VALID OR EXPIRED, INCLUDING COPY OF SHIP'S CERTIFICATE OF REGISTRY, TRIM AND STABILITY BOOKS AS WELL AS PLANS AS MAY BE ON BOARD, EXCEPTING THOSE WHICH BUYERS REQUIRE FOR THE DELETION FROM PRESENT PORT OF REGISTRY AND EXCEPTING DECK AND ENGINE LOG BOOKS. SELLER SHALL REPLACE SUCH DOCUMENTS BY FURNISHING BUYERS WITH PHOTOCOPIES OF THE SAME.

10. THE VESSEL SHALL BE DELIVERED WITH EVERYTHING ON BOARD SUBSTANTIALLY  INTACT WITHOUT REMOVALS EXCEPT MASTER, OFFICERS AND CREWS PERSONAL EFFECTS  AND MASTER SLOP CHEST AND FREON/OXYZEN/ ACETYLENE CYLINDER BOTTLES WHICH WILL BE REMOVED FROM THE VESSEL AFTER DELIVERY AND PRIOR BEACHING.

11. THE PHYSICAL DELIVERY OF THE VESSEL SHOULD BE MADE BY THE SELLERS TO THE BUYERS OR ANY 3RD PARTY DULY AUTHORIZED BY THE BUYERS FOR DEMOLITION ONLY. BUYERS GUARANTEE AND UNDERTAKE TO DEMOLISH THE VESSEL AND UNDER NO CIRCUMSTANCES RESELL OR USE THE VESSEL FOR FURTHER TRADING PURPOSES.

12. THE SELLERS AGREE TO ALLOW THE BUYERS OR THEIR NOMINATED REPRESENTATIVES UPTO A MAXIMUM OF 2 PERSONS IN NUMBER TO STAY ON BOARD THE VESSEL AT BUYER'S RISK AND EXPENSES IMMEDIATELY ON ARRIVAL OF THE VESSEL AT ALANG/ W.C.INDIA OR UPTO A MAXIMUM OF 8 (EIGHT) PERSONS TO STAY ON BOARD IN CASE OF CHITTAGONG/ BANGLADESH AND TEN (10) PERCENT DEPOSIT HAS BEEN LODGED FOR FAMILIARIZATION AND PLANNING PURPOSES ONLY. SUCH PERSONS SHOULD NOT INTERFERE AND DISRUPT IN THE DUTIES OF THE CREW AND SHOULD UPON REQUEST OF THE MASTER SIGN LETTER OF INDEMNITY.

13. SELLERS TO MAINTAIN AND PAY FOR AT LEAST 7 CREW MEMBERS (MAINLY BELONGING TO THE ENGINEROOM) INCLUDING THE MASTER AND 2 CERTIFIED ENGINEERS AND 1 RADIO OFFICER AS WELL AS WITH SUFFICIENT USEABLE, PUMPABLE BUNKERS, FRESH WATER AND PROVISIONS FOR 7 DAYS LYING AND 1 DAY STEAMING FOR BEACHING ASSISTANCE TILL THE NEXT SUITABLE TIDE FOR BEACHING AFTER DELIVERY OF THE VESSEL TO THE BUYERS. THE BEACHING SHALL BE AT BUYERS RISK AND COST WITH SELLERS PROVIDING ONLY ASSISTANCE AS ABOVE WITH RISK OR LIABILITY TO SELLERS, THEIR OFFICERS,AGENTS OR OTHERS HOWEVER CONNECTED WITH SELLERS..

14. SELLERS UNDERTAKE TO ASSIST BUYERS IN BEACHING THE VESSEL WITH THE HELP OF THE MASTER AND 6 CREW MEMBERS MAINLY BELONGING TO THE ENGINEROOM INCLUDING 2 ENGINEERS AND 1 RADIO OFFICER FOR A PERIOD AS SPECIFYING IN CLAUSE 13 HEREINABOVE.

15A. SHOULD THE VESSEL BECOME TOTAL OR CONSTRUCTIVE TOTAL LOSS BEFORE DELIVERY, THIS CONTRACT SHALL BE CONSIDERED NULL AND VOID AND THE DEPOSIT ,IF LODGED, SHALL BE IMMEDIATELY RETURNED TO THE BUYERS.

15B. SHOULD THE VESSEL SUFFER SUBSTANTIAL PARTIAL DAMAGE DUE TO ANY REASON BEFORE DELIVERY AFFECTING THE LDT OF THE VESSEL, THE BUYERS WILL HAVE THE OPTION TO CANCEL THIS AGREEMENT.

15C. IF THE SELLERS ARE NOT ABLE TO TRANSFER TITLE OF THE VESSEL OR THE BUYERS SHALL BE UNABLE TO ACCEPT TRANSFER OF THE VESSEL BOTH IN ACCORDANCE WITH THIS CONTRACT DUE TO OUTBREAK OF WAR IN INDIA OR BANGLADESH OR IF THE VESSEL SHOULD BECOME AN ACTUAL OR CONSTRUCTIVE TOTAL LOSS, THEN EITHER THE SELLERS OR THE BUYERS MAY TERMINATE THE CONTRACT UPON WRITTEN OR TELEGRAPHIC NOTICE FROM ONE PARTY TO THE OTHER WITHOUT ANY LIABILITY UPON EITHER PARTY HEREUNDER. THE DEPOSIT REFERRED TO IN CLAUSE 2 HEREOF, IF DELIVERED TO THE SELLERS, SHALL BE RELEASED TO THE BUYERS FORTHWITH AND THE AGREEMENT SHALL THEREUPON BE NULL AND VOID.

16A. IF DEFAULT BE MADE BY BUYERS IN PAYMENT OF PURCHASE PRICE (10 PCT A/O BALANCE) THE SELLERS HAVE THE RIGHT TO CANCEL THIS CONTRACT IN WHICH CASE THE AMOUNT DEPOSITED IN CLAUSE 2 SHALL BE FORFEITED TO THE SELLERS. IF THE DEPOSIT DOES NOT COVER SELLER'S PROVEN LOSS, THEN THEY SHALL BEEN ENTITLED TO CLAIM FURTHER COMPENSATION FOR THEIR PROVEN LOSSES AND FOR ALL PROVEN EXPENSES. SUCH COMPENSATION SHALL ONLY BE PAYABLE BY BUYERS PROVIDED THAT THE DEFAULT ON BUYERS' PART IS FOR CAUSES OTHER THAN THOSE REFERRED TO IN CLAUSE 15 C.

16B. IF DEFAULT BE MADE BY SELLERS IN THE EXECUTION OF THE DULY AUTHENTICATED BILL OF SALE, OR IN THE DELIVERY OF THE VESSEL AND HER EQUIPMENT IN THE MANNER AND WITHIN THE TIME HEREIN SPECIFIED, THE DEPOSIT SHALL AT ONCE BE RETURNED TO BUYERS. THE BUYERS SHALL BE ENTITLED TO CLAIM COMPENSATION FOR THEIR PROVEN LOSSES AND PROVEN EXPENSES CAUSED TO THE BUYERS BY SELLERS' DEFAULT. SUCH COMPENSATION SHALL ONLY BE PAYABLE BY SELLERS PROVIDED SUCH DEFAULT ON SELLERS' PART IS FROM CAUSES OTHER THAN THOSE REFERRED TO IN CLAUSE 15C.

17. SHOULD THE SELLERS FEEL THAT THE VESSEL WILL NOT BE READY TO TENDER THE NOTICE OF READINESS FOR DELIVERY IN ACCORDANCE WITH THE CONDITION OF THIS AGREEMENT BY 15TH AUGUST 1998, THEN WITHIN 48 HOURS OF SELLERS NOTIFYING SUCH POSITION TO BUYERS IN WRITING THE BUYERS SHALL IMMEDIATELY DECLARE WHETHER THEY WILL MAINTAIN OR CANCEL THIS AGREEMENT. IF THE BUYERS ELECTS TO CANCEL THIS AGREEMENT, THE DEPOSIT SHALL BE IMMEDIATELY RETURNED TO BUYERS. IF THE BUYERS FAIL TO DECLARE THEIR POSITION IN WRITING WITHIN 48 HOURS OF SUCH NOTIFICATION THEN THE SELLERS SHALL AUTOMATICALLY UNDERSTAND THAT THE BUYERS HAVE NO OBJECTION TO THE CANCELLING DATE OF THE VESSEL BEING EXTENDED, IN WHICH CASE ALL OTHER TERMS AND CONDITIONS OF THE AGREEMENT SHALL REMAIN ICN FULL FORCE AND EFFECT. HOWEVER IF CANCELLING DATE EXTENDED THE NEW CANCELLING DATE SHOULD BE DECIDED BY MUTUAL AGREEMENT BETWEEN BUYERS AND SELLERS.

12-AUG-1999  17:05      PACKARD                                    441226383839    P.45/47

18. THE VESSEL IS DESCRIBED AS FOLLOWS:

```
NAME.............................  VRITA N
EX-NAMES.........................  BRITANIA EX BLUESTONE EX ASIA SWALLOW
TYPE.............................  BULK CARRIER
YR BLT...........................  1971
BLDRS............................  OSAKA SIPBUILDING CO. LTD,JAPAN
FLAG.............................  CYPRUS
CLASS............................  HELLENIC REGISTER
DEADWEIGHT.......................  24511 MTNS
DRAFT............................  9.95M
L.O.A. ..........................  165.36M (REGISTERED)
BEAM ............................  22.80M (REGISTERED)
LIGHT SHIP.......................  6210 METRIC TONS   EQUIVALENT
                                   TO 6112.20 LONG TONS
GRT .............................  14824 (REGISTERED)
NRT .............................  8058 (REGISTERED)
NO OF HOLDS......................  5
NO OF HATCHES....................  5
CARGO GEAR.......................  FOUR CRANES OF 10 TONS EACH
MAIN ENGINE......................  SULZER 6RND-68  9900PS
AUXILIARY GENS...................  3 SETS DAIHATSU 6PS TB-22 850HP
AUXILIARY ALTER..................  3 GENERATORS FUJI ELECTRIC 310KW,440V,6.
WORKING PROP.....................  BRONZE
SPARE PROP.......................  BRONZE
SPARE TSHAFT.....................  YES
PERMANENT BALLAST................  NO
REMOVALS.........................  ALL BOTTLES
CONSTRUCTION.....................  DOUBLE SKIN - MAINLY WELDED
LAST CARGOE......................  WOODCHIPS
IF BALLAST TANKS COATED .........  ORIGINALLY COATED BUT DOCUMENTARY
                                   EVIDENCE NOT AVAILABLE
LAST FIVE (5) CARGOES ...........  WOODCHIP (LAST 3) CEMENT,WOODCHIP
```

ALL GENERATORS IN WORKING CONDITION

DELIVERY DRAFT : THE VESSEL IS TO BE DELIVERED WITH MAXIMUM AFT
                LIGHT DRAFT OF 17 FEET

19. IF ANY DISPUTE SHOULD ARISE IN CONNECTION WITH THE INTERPRETATION
IN FULLFILMENT OF THIS CONTRACT, SAME SHALL BE DECIDED BY ARBITRATION
IN THE CITY OF LONDON, UK WITH ENGLISH LAW TO APPLY AND SHALL
BE REFFERED TO A SINGLE ARBITRATOR TO BE APPOINTED   THE PARTIES
HERETO. IF THE PARTIES CANNOT AGREE ON THE APPOINTMENT OF THE SINGLE
ARBITRATOR, THE DISPUTE SHALL BE SETTLED BY THREE ARBITRATORS, EACH
PARTY APPOINTING ONE ARBITRATOR THE THIRD BEING APPOINTED BY LONDON
MARITIME ARBITRATION ASSOCIATION IN LONDON. IF EITHER OF THE
APPOINTED ARBITRATORS REFUSES OR IS INCAPABLE OF ACTING, THE PARTY
WHO APPOINTED HIM SHALL APPOINT A NEW ARBITRATOR IN HIS PLACE.

IF ONE PARTY FAILS TO APPOINT AN ARBITRATOR EITHER ORIGINALLY OR BY
WAY OF SUBSTITUTION FOR TWO WEEKS AFTER THE OTHER PARTY HAVING APPOINTED
HIS ARBITRATOR, HAS SENT THE PARTY MAKING DEFAULT NOTICE BY MAIL,
CABLE OR TELEX TO MAKE THE APPOINTMENT, LONDON MARITIME ARBITRATION
ASSOCIATION SHALL AFTER APPLICATION FROM THE PARTY HAVING APPOINTED
HIS ARBITRATOR ALSO APPOINT AN ARBITRATOR ON BEHALF OF THE PARTY MAKING
DEFAULT. THE AWARD RENDERED BY THE ARBITRATORS SHALL BE FINAL AND BINDING
UPON THE PARTIES AND MAY IF NECESSARY BE ENFORCED BY ANY COURT OR
ANY OTHER COMPETENT AUTHORITY IN THE SAME MANNER AS A JUDGEMENT IN
THE COURT OF JUSTICE.

20. ALL COSTS AT THE PORT OF DELIVERY, SUCH AS HARBOUR DUES, LOCAL TUGS
ASSISTANCE, PILOTAGES, AND SELLERS' AGENTS FEES ARE FOR THE ACCOUNT OF
THE SELLERS.

21. CUSTOMS DUTY, SALES TAX, IF ANY, PAYABLE IN INDIA OR BANGLADESH IS

FOR BUYERS' ACCOUNT.

22. THE PROTOCOL OF DELIVERY AND ACCEPTANCE WILL BE SIGNED BY (I) THE MASTER AND THE AGENT OF THE VESSEL AND (II) BUYERS REPRESENTATIVE IMMEDIATELY AFTER PAYMENT OF THE FULL PURCHASE PRICE TO THE SELLERS.

23. THE VESSEL IS TO BE DELIVERED TO THE BUYER OR BUYER'S NOMINATED REPRESENTATIVE AS PER CLAUSE 4 HEREINABOVE.
DELIVERY OF THE VESSEL WILL BE WITH MAXIMUM DRAFT AS DESCRIBED IN CLAUSE 18.

24. THE SHIP IS SOLD "AS IS", NO REPRESENTATIONS HAVE BEEN MADE BY SELLERS AS TO ITS CONDITION EXCEPT THAT THE VESSEL IS FREE OF FIRE DAMAGE, FREE OF COLLISION DAMAGE AFFECTING THE VESSEL'S LIGHT WEIGHT AND IN CONDITION RELEVANT TO HER AGE AND USE, THE BUYERS HAVE WAIVED INSPECTION OF THE SHIP AND HER CLASS RECORDS AND THIS SALE THEREFORE IS OUTRIGHT AND CONFIRMED SUBJECT TO THE TERMS OF THIS M.O.A. ONLY.

25. THIS SALE AND ALL ITS TERMS TO BE KEPT STRICTLY PRIVATE AND CONFIDENTIAL.IF REPORTED BY ANY PARTY INVOLVED, SAID PARTY TO BE RESPONSIBLE TO THE OTHER PARTIES FOR ANY DAMAGE SUFFERED BY SUCH PARTY DUE TO DISCLOSURE OF THIS SALE.

FOR THE BUYERS

- - - - - - - - - - - -

FOR THE SELLERS

- - - - - - - - - -

For URITA MARINE Co LTD
Andrew C. Bagias
Duly authorised by
Power of Attorney dated 25nd J

22. THE PROTOCOL OF DELIVERY AND ACCEPTANCE WILL BE SIGNED BY (I) THE MASTER AND THE AGENT OF THE VESSEL AND (II) BUYERS REPRESENTATIVE IMMEDIATELY AFTER PAYMENT OF THE FULL PURCHASE PRICE TO THE SELLERS.

23. THE VESSEL IS TO BE DELIVERED TO THE BUYER OR BUYER'S NOMINATED REPRESENTATIVE AS PER CLAUSE 4 HEREINABOVE. DELIVERY OF THE VESSEL WILL BE WITH MAXIMUM DRAFT AS DESCRIBED IN CLAUSE 18.

24. THE SHIP IS SOLD "AS IS", NO REPRESENTATIONS HAVE BEEN MADE BY SELLERS AS TO ITS CONDITION EXCEPT THAT THE VESSEL IS FREE OF FIRE DAMAGE, FREE OF COLLISION DAMAGE AFFECTING THE VESSEL'S  LIGHT WEIGHT AND IN CONDITION RELEVANT TO HER AGE AND USE, THE BUYERS HAVE WAIVED INSPECTION OF THE SHIP AND HER CLASS RECORDS AND THIS SALE THEREFORE IS OUTRIGHT AND CONFIRMED SUBJECT TO THE TERMS OF THIS M.O.A. ONLY.

25. THIS SALE AND ALL ITS TERMS TO BE KEPT STRICTLY PRIVATE AND CONFIDENTIAL. IF REPORTED BY ANY PARTY INVOLVED, SAID PARTY TO BE RESPONSIBLE TO THE OTHER PARTIES FOR ANY DAMAGE SUFFERED BY SUCH PARTY DUE TO DISCLOSURE OF THIS SALE.

FOR THE BUYERS                              FOR THE SELLERS

" CREGULF TRADING L.L.C.                    ------------------

(DIRECTOR)

EXHIBIT "B"

COPY

## IN THE MATTER OF THE ARBITRATION ACT 1996

### AND

### IN THE MATTER OF AN ARBITRATION

BETWEEN:-

VRITA MARINE CO LTD
    of Nicosia, Cyprus

                                       Claimants
                                       (Sellers)

and

SEAGULF TRADING LLC
    of Dubai, UAE

                                       Respondents
                                       (Buyers)

## "VRITA N"

Memorandum of Agreement dated 15 July 1998

# FINAL ARBITRATION AWARD

WHEREAS:

1.   By a Memorandum of Agreement dated 15 July 1998 Vrita Marine Co Ltd ("the sellers") undertook to sell and Seagulf Trading LLC ("the buyers") agreed to buy the elderly handy sized bulk carrier "VRITA N" for demolition on the terms and conditions as set out therein.

1

2.    A 10% deposit in the sum of US$73,346.40 was paid into a joint escrow account by the buyers and the vessel was instructed to proceed to Chittagong where she was to be delivered by the sellers in exchange for the release of the 10% deposit plus the balance of the agreed price.

3.    In the event, the vessel arrived off Chittagong on 30 July 1998 but disputes arose between the parties and the buyers refused to take delivery of the vessel. As a result, the sellers sold the vessel at a reduced price to other buyers.

4.    The Memorandum of Agreement contained the following arbitration clause:

"If any dispute should arise in connection with the interpretation in fullfilment of this contract, same shall be decided by arbitration in the City of London, UK with English Law to apply and shall be referred to a single arbitrator to be appointed the parties hereto. If the parties cannot agree on the appointment of the single arbitrator, the dispute shall be settled by three arbitrators, each party appointing one arbitrator the third being appointed by London Maritime Arbitrators Association in London. If either of the appointed arbitrators refuses or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.
If one party fails to appoint an arbitrator either originally or by way of substitution for two weeks after the other party having appointed his arbitrator. has sent the party making default notice by mail. cable or telex to make the appointment, London Maritime Arbitrators Association shall after application from the party having appointed his arbitrator also appoint an arbitrator on behalf of the party making default. The award rendered by the arbitrator shall be final and binding upon the parties and may if necessary be enforced by any court or any other competent authority in the same manner as judgement in the Court of Justice."

5.    In accordance with the arbitration clause in August 1998 the parties appointed as sole arbitrator the undersigned William Packard of 20 Victory Road. West Mersea. Colchester. Essex. CO5 8LX. I am a full member of the London Maritime Arbitrators Association, a member of The Baltic Exchange in London and a Chartered Shipbroker.

2

6.    The sellers claimed as follows:

a) the 10% deposit of US$73,364.40 plus accrued interest

b) the difference in price between the proceeds of the Seagulf MOA
dated 15 July (nett of commissions) and the substitute MOA with Silvia
(nett of commissions) which they calculated as US$224,928.96

c) interest on the Seagulf MOA from 11 to 14 August 1998

d) interest on the Silvia MOA from 15 August 1998 to the date of
payment

e) additional ship's costs at Chittagong of US$67,253.93

f) estimated additional Chittagong port/agency expenses of US$7,500.00

g) estimated additional owners' costs of US$25,000.00

7.    The buyers counterclaimed as follows:

a) the 10% deposit of US$73,364.40 plus accrued interest

b) loss of profits on the difference between the prices agreed by way of
the head MOA and under the MOA with East Queen of US$40,340.52

c) interest on (b)

8.    Written submissions were exchanged and a hearing took place before me at
The Courtyard, 124 Aldersgate Street, London EC1 4JQ on 27 through to 30
July 1999 inclusive, during which both parties were represented by counsel
and solicitors and both called witnesses and experts.   Both requested a
Reasoned Award and, accordingly, my Reasons are set out in the document
annexed hereto that forms part of this Award.

3

NOW I, the said William Packard, having taken upon myself the burden of this reference, and having carefully and conscientiously read and considered the submissions made and the documents put before me and listened to the arguments of counsel and the evidence of witnesses and having given due weight thereto DO HEREBY MAKE, ISSUE AND PUBLISH this my FINAL ARBITRATION AWARD, as follows:

A)   I FIND AND HOLD that the sellers' claim is successful in the sum of US$222,484.08 and no more.

B)   I THEREFORE AWARD AND ADJUDGE that the principal sum of US$73,346.40 (seventy three thousand, three hundred and forty six United States Dollars and 40 cents) presently on deposit in an interest-bearing joint bank account with The Royal Bank of Scotland PLC, 61, Akti Miaouli Street, Piraeus, Greece in the joint names of St. James Shipping Inc (as managers of the sellers) and Seagulf Trading LLC is to be released by the Bank forthwith to the order of St James Shipping Inc. Any authority required by the Bank is to be provided immediately by Seagulf Trading LLC.

C)   I FURTHER AWARD AND ADJUDGE that the buyers shall forthwith pay to the sellers the additional sum of US$149,137.68 (one hundred and forty nine thousand, one hundred and thirty seven United States dollars and 68 cents).

D)   I AWARD AND DIRECT that the buyers shall forthwith pay to the sellers compound interest on the total sum awarded of US$222,484.08 at the rate of 7.5% per annum to run with quarterly rests from 10 August 1998 as follows:

(a)   on US$73,346.40 until release of the funds by The Royal Bank of Scotland.

(b)   on US$149,137.68 until payment by the buyers.

4

E) I FURTHER AWARD AND DIRECT that any interest accruing on the deposit escrow account with The Royal Bank of Scotland is to be released by the Bank forthwith to the order of Seagulf Trading LLC, less any bank charges incurred by the Bank.

F) I FURTHER AWARD AND DIRECT that the buyers shall bear and pay the cost of this my FINAL ARBITRATION AWARD which I hereby determine and settle in the sum of *£10,463.00 (ten thousand, four hundred and sixty three pounds Sterling)* inclusive of my fees and disbursements PROVIDED ALWAYS that if, in the first instance, the sellers shall have paid any amount in respect of the costs of this my FINAL ARBITRATION AWARD, they shall be entitled to immediate reimbursement from the buyers of the sum so paid plus compound interest thereon at 7.5% per annum to run with quarterly rests from the date of payment of my costs under this award until the date the buyers reimburse the sellers in respect of my costs. → Interest = £8,496.20

US$ 20,630.93

GIVEN UNDER MY HAND in London this 11th day of August 1999

The seat of the arbitration is England

William Packard

Witness

5